Case number 25-5091. National Treasury Employees Union et al versus Russell Vought in his official capacity as acting director of the Consumer Financial Protection Bureau and Consumer Financial Protection Bureau appellant. Mr. MacArthur for the appellant, Ms. Bennett for the appellate. Good afternoon, Mr. MacArthur. Welcome back. You may proceed when you're ready. Thank you, Judge Pillard, and may it please the court. In this case, at its core, it's about who has the responsibility to ensure that the CFPB will perform its statutory duties. Politically accountable executive branch officials or courts acting at the behest of plaintiffs who seek not to challenge discrete agency actions or inactions that injure them, but instead to launch a preemptive strike against the possibility that the Bureau will fail to perform its statutory duties. The answer to that question is clear as a matter of both precedent and first principles. Under Article II, it is the president who is charged with taking care to ensure that the laws are faithfully executed, and under the APA, courts have no license to engage in general legal oversight of the executive branch's implementation of the law. Rather, the proper and properly limited role of courts is to redress specific injuries caused by discrete legal violations in cases or controversies within their jurisdiction. Mr. MacArthur, you don't dispute that if the agency were taking action to close down the CFPB that the courts would have a role to enjoin it from doing that? I do not dispute that if there were a decision made to shut down the CFPB without legislation to that effect, that would be unlawful. I think it is an entirely separate question what role the courts have to play, where you have to walk through all of the analysis of, is there a plaintiff here who has standing, who has a cause of action, all of that has to be done before you can decide what role a court has to play. Just quickly, could you just tick through, for example, would the National Consumer Law Center have standing? So, I don't think any of the plaintiffs here have standing. I'm happy to start with the National Consumer Law Center. No, but just tell me, so they wouldn't have standing and they wouldn't have a cause of action? That's correct. They don't have a cause of action under the APA because there is no final agency action, and they don't have a direct cause of action under the Constitution because they only have a statutory claim here, not a constitutional separation. But I'm asking you on the assumption that there's a policy decision made to close the agency, there would be final agency action, surely? I think it is possible to conceive of a decision to close the agency that would be final agency action. I do not think we have that here. I understand you don't think we have that here, which is why I said, you know, on the assumption that there were such a decision made and it were being undertaken. For example, we have this decision that the plaintiff said in the Venetian Casino Resort case where there's a question whether there's final agency action, and, you know, is this a manual? Is it memorialized somewhere? And the court says it really doesn't matter whether it's formally memorialized. What matters is whether it's such a decision and it's final and it's subject to APA review. So I would assume that if, you know, you dispute my premise, but I assume that if it were the case that they had made such a policy decision that you would not argue that there's no final. If you walk through the two prongs of the Venet final agency action test and found that whatever decision had been made and however had been memorialized was the consummation of the agency's decision-making process and it had direct and appreciable legal effects, then you would have final agency action. We don't have any of that here. Would the shutting down of the CFPB pursuant to an official decision to do so have have the kinds of effects that Prong 2 of Venet requires? I'm not sure that it would on its own. I think that the various actions that are taken to implement that decision certainly would. So if you are terminating employees, that would be a final agency action. Our issue here with the employees is not the absence of final agency action. It is CSRA preclusion. So any claims that are premised on injuries resulting from loss of employment are outside the district court's jurisdiction because Congress has channeled those claims to a separate review scheme under the CSRA. I understand you're channeling arguments, but so with respect to the public that is protected by the CFPB's functions like the various organizational, organizations that are claiming official standing, would there be legal consequences to them cognizable under the Venet test? I don't think there would be any direct legal consequences to them because they are not being regulated or otherwise directly acted upon by these internal operating decisions. They are affected, if at all, only because those internal operating decisions, by hypothesis, result in the agency not performing statutory duties. And then it's the absence of those duties, those government services that they claim injures them. But I do want to go back and walk through why I think there is no plaintiff here who has standing to challenge the quote unquote shutdown. So no standing, no cause of action. If I were to disagree with you about that, or if the court were to disagree with you, I think there is a plaintiff with standing. And with respect to, again, this is all on the premise, which I know you dispute, that there was a policy decision taken to close the agency. Your other objections on that premise are what? I think the other ones are that the district court didn't apply the correct legal standard here. The district court should have applied the analysis under 5 U.S.C. 706-1. That's the standard for agency action. To compel agency action. That's correct. And then I think also independently, there's a lack of irreparable harm to the plaintiffs here. And that by itself is a reason to vacate the injunction. Going back. Can I just ask? Sure. The agency action feels a little hard to pin down because it's an internal email. It's not quite about shutdown. You have to aggregate things together. But suppose, again, with Judge Pillard's hypo, suppose there were a written down, formally expressed, not tentative order from the acting agency head saying this agency will shut down. Do you still have a Lujan discreteness problem at that point? I think you might. Here's where I struggle with this hypothetical. I don't think I have to take it. I'm trying to sort of isolate on what work, if any, discreteness is doing in this analysis. Right. I think it's not just discreteness there. I think it's also direct and appreciable legal effects. I think in that hypothetical, then a prong one is satisfied, which I do not think it is on the facts here. Because you have something there that at least- Prong one is conclusive. Consummation of the decision-making process. The thing that I struggle with in that hypothetical is whether or not that sort of internal operating decision has the sort of appreciable and direct legal effects that would satisfy Bennett prong two. Here's a hypothetical. Suppose the agency head says, I want to promulgate 10 rules through notice and comment rule making, and signs a formal memo making that as a decision and directing subordinates within the agency to promulgate notice and comment rules on the following 10 subjects. That probably satisfies Bennett prong one but fails Bennett prong two because there isn't yet the direct and appreciable legal effects. So that's how I look at prong two here. Isn't part of that prong that Bennett is focused primarily on finality? I mean, to judge Cass's discussion, discreet agency action is a related but also distinct point. It is related and distinct, and I think it's related in the following way, which is when you have an agency action that is not directly regulating someone out in the world, and the internal operating decisions that you have made as an agency are going to cause the agency to fail to fulfill statutory duties, and then it's the absence of those statutory duties that actually injures the plaintiff. I actually really think you should start with the injuries of the plaintiffs to see what agency action or inaction they arise from. And here for the consumer advocacy groups who are saying they are harmed by the potential absence of these government services, it is agency inaction. I don't think you can do an end run around 706.1 by saying that, sorry. But we do that every day. I mean, for example, if the head of this agency had promulgated a notice in the Federal Register and said we're going to shut down this agency ASAP, and then they were in the midst of doing the kinds of things that are reflected in this record, I can't imagine that we would say, well, that has to be challenged as a withholding of or delay of agency action under the APA. We would entertain a challenge that that is action that is arbitrary or contrary to law under the APA. I mean, I think it would depend, Judge Pillard, on what the nature of the injury asserted by a particular plaintiff is. If it's an employee who was fired pursuant to this hypothetical shutdown plan, absolutely, that's agency action. And those are discrete agency actions. The problem with them is the assertion. Plaintiff challenges inaction. We don't then reanalyze all the smallest granularity of what they might have challenged. The plaintiffs come into us all the time. Petitioners say, there's a rule, I don't like the rule, here's how it's harming me, and that is what we review. And I'm interested that you are, I mean, I recognize that you have factual claims about whether this meets the standard of an action to shut down the, a decision to shut down the agency, but if it were, it's hard for me to see your, how, you know, you're shifting the baseline and saying, well, they have to meet this mandamus-like standard that this is actually being unreasonably held. Right. And I don't mean to be taking a definitive position on that. I think it's a, I think it's a difficult question. I think our more fundamental point is that here there is no such action. There are only two actions that were identified by the district court as candidates for final agency action here. One is the February 10th email, which clearly is not even agency action to begin with, let alone final agency action. That was a temporary provisional directive giving in, given in evolving circumstances on the morning of the acting director's first day on the job that had no direct or appreciable legal consequences and didn't even finally decide whether any given work would be done or permitted to be done. So that one's not final agency action under the APA. And then we have this other thing, this amorphous decision that the district court inferred. And I have a hard time thinking about and talking about this decision in the same way I have a hard time thinking and talking about things that don't exist because there is no such decision. And we can talk about all the reasons why we think the district court's finding in that regard was clearly erroneous, but even if you stipulate and set that to the side, there's still not a final agency action there or a decision that you can put eyes on and evaluate. At best, there was an imputation by the district court that in the mind, I suppose, of the acting director, there was a plan or an intent or a goal to shut down the agency. That is not agency action, let alone final agency action. Agency heads all the time have goals or plans or intents in their mind that govern how they interact with their staff on a day-to-day basis and the sorts of directives they give. No one has ever thought that that is final agency action reviewable under the APA. That is, I mean, frankly, speaking about the facts of this case, as reflected in the record before us, the notion that this was nothing more than a plan in somebody's head is to credit when there were massive actions taken that dislocate hundreds of people's lives and halt services that affect hundreds of thousands of people's lives. I understand that there were actions. I'm not meaning to dispute that, Judge Pillard. The point is that they're trying to get over the various threshold problems, including the absence of a cause of action, by skipping past those discrete actions that had actual effects and saying behind them there was a reviewable decision that unifies all of these otherwise individual discrete actions. And that's the sort of hypothesized decision that, as best I can tell, that's what the district court meant, that there was a plan. That was the word the district court used repeatedly. There was a plan to shut down the agency. I do not think that is... She had used the word policy decision. Different result under the Venetian Casino Resort case? I mean, possibly. Again, it's difficult to talk about something that you can't, like, open the JA and look at. If there were an actual policy decision, we could have a different conversation. But we don't have that. We have something that was inferred that we can't look at and see what the contours of it are. But suppose it was there. I'm coming back to my hypo. It's in writing. It's definitive. And I asked you, is that reviewable? Your first answer was no, because there's still no final agency action prone to a Venet. I get that answer. Is there an independent answer? No, because still too programmatic under Lujan and SUBA. I do think there is, because, again, start with the injury of the plaintiff, that the plaintiff is asserting. The plaintiff is asserting there is an absence of performance of a duty, and that's injury. So you can imagine just a simple case of a plaintiff who says, there's a statutorily required report that the agency has failed to produce. And they want to bring a claim to say, I need this report. I use it in my organizational activities. Without it, I'm injured. You're required by statute to produce it. You haven't produced it. I don't think you get to... Injury is relevant for standing purposes. I'm not sure why it's relevant to this question about how we slice up the world into actions that are either focused enough or too programmatic. Well, I think I'm trying to get at that with this hypothetical, which is in that situation, I think the claim that a plaintiff has is for agency action unlawfully withheld. I don't think that plaintiff gets to hop, skip over that and say that, well, behind that unlawfully withheld action, there must have been a decision to withhold it. And I'm going to challenge that decision instead and free myself from the standards that apply to 706.1 and get the benefit of the standards that apply to 706.2, or I can now say this is arbitrary and capricious or whatever. I think that's my fundamental concern about conceiving as a claim that at base is a claim of, you're not doing something that the statute requires you to do, and that is injuring me as a final agency action as opposed to a claim of inaction. So the district court found that there was a decision taken, an authoritative decision taken to shut down the agency. And the district court made a finding based on a lot of evidence, including Martinez, who the agency produces their authoritative witness, who in many different days talked about the agency being shut down. There's no need to have a retention register. We've shortened the time administratively because there won't be any jobs for incoming employees to bid on to the agency. And you have the evidence of people that we know the executive believes are the boss, saying that they did the right thing in getting rid of the CFPB. We have the influential head of Department of Government Efficiency posting CFPB RIP, cancellation of essentially all contracts, firing all employees, and saying that the next stage would be to fire the rest, including Martinez. So there's a lot of factual evidence raising solid inferences as to what the district court found. And your response to that, I take it is that's all a misunderstanding. If you look at ensuing communication, principally once the hearing was scheduled and after the case is filed, it becomes clear that what was meant all along was we're just going to tear the agency down and redirect it according to the new administration's policies and not to shut it down. Is that fair in terms of what the government's position is factually, or do you have something that more directly goes to the initial finding of a decision, authoritative decision? Shut the agency down. We don't think there was ever any decision authoritative or otherwise to shut down the agency. And you have evidence that that was clearly erroneous is why. But the finding to the contrary is why. So there are five points that I would make as to why that finding was clearly erroneous. But before I go through those five, I do just want to set the table, because I think there is a lens through which you should view the record in this case. And I think Judge Filler, your question was getting at this, but there are two competing stories here about what's going on. Length of story and the district court's finding is that this is a plan to shut down the CFPB entirely. What I take to be the operative policy here is the one that's reflected in the February 26th joint OMB OPM memo. This is the memo put out by acting director Vogt in his capacity as the director of OMB, where it says, pursuant to the president's direction, agency should focus on the maximum elimination of functions that are not statutorily mandated while driving the highest quality, most efficient delivery of their statutorily required functions. I think it's very clear that the new leadership of the Bureau has a radically different vision for this agency than the way it has been operated in the past and wants to downsize this agency, to strip it down as it were to the statutory studs. That is a lawful policy. Shut down the agency, unlawful. Do only the bare statutory minimum, lawful. Whether that latter policy decision is good policy or bad policy is not for the courts to review. That is ultimately for the American people to decide whether that's a good policy through their elected representatives and ultimately at the ballot box. Can you speak to the temporal aspect of this? Because maybe on February 8th or February 10th, I guess February 8th was the date of the first complaint, maybe there were reasonable inferences that the agency was going to be shut down as it were, but that over time the actions taken by the leadership suggest that there's a different understanding that like what shut down meant or what really meant was to keep the statutory minimum. How do we think about that temporal aspect? I think the evidence, Judge Rao, is there right from the start, from February 10th. There's no voluntary cessation. I don't think there's a voluntary cessation issue here. As I understand it, the district court's focus was on February 10th. February 8th, which was I think acting director vote was appointed like that evening, on a Friday evening and sent out a memo saying that activities required by law should continue. The district court said, that's not my focus. I'm focused on February 10th. And what you'll see if you look at the record is starting on February 10th itself, there were actions taken by the new bureau leadership, in particular by Mark Palette, the chief legal officer, to ensure that statutory functions were being performed. There's, if you start at JA page 283, there are over 100 pages of emails starting on February 10th and continuing over the next couple of weeks, culminating ultimately in March 2nd, when Mr. Palette sends out a second email saying everyone should be doing their statutory duties without reapproval. Would the preliminary injunction have been justified based on the Are you asking about as an evidentiary matter or all of the threshold issues? Well, I mean, you know, I mean, is there, it's just looking at the February 10th email, could the district court have at least not clearly erroneously concluded that there was a shutdown? Oh, no, I don't think so. Even if you just look at the face of the February 10th email, there is nothing whatsoever unlawful about that email, which is, it's a pause of non-urgent work. That doesn't say we're not going to perform our statutory duties. And that was, again, this was at a particular moment where the building was shut down for the week because it was unsafe to come in because of the protest activity around the building. And it was a provisional and temporary measure to help the Bureau's new leadership get operational control of the agency. And work started getting approved that very day. Mark Palette was approached about the complaint hotline and database. He was approached about the mortgage rate and he approved both of those to start happening that very day. If you were shutting down the agency, why do you do any of that? Next day, February 11th. You can see this in the joint appendix. Let me find the citation for you. This is at pages 416 to 417. You see that the CFO directs his- Say again. 416 to 417? Yeah, JA 416 to 417. You see that the CFO directs his deputies to identify all contracts that support a statutory requirement. And within a week, this is in the district court's opinion at 654 to 55 of the joint appendix, Mark Palette sends out an email saying, do not cancel any contracts without my express approval or the express approval of the acting director and starts rescinding contract termination notices. There is activity going on throughout this two-week period where you can see the Bureau's leadership taking active steps to ensure that statutory duties are being performed and the district court simply brushed all of that aside. Did Mr. Palette then turn around and cancel all the contracts, including those that had been identified by staff as necessary for statutorily required work? Cancellation of the contracts was before that, before he started rescinding some of them. It wasn't all the contracts. It was contracts in particular units. But then he asked for identification of which of all of these contracts support a statutory function. And he went through those and he rescinded the ones that he concluded were necessary for statutory functions. And the district court didn't deny that. What the district court faulted them for is for taking too narrow a of what is necessary, what sorts of contracts are necessary to support statutory functions. That's not a finding that they're not performing their statutory duties. That's not a finding that the district court has any business making. So I think I've hit. Sorry, is this an argument that the finding of a shutdown decision was clearly erroneous, or is this an argument that the district court didn't really make that finding, but they were squabbling about what functions- The former. The former. The points I just hit were some of the points that I wanted to respond to and I think you said you had five. Yeah. I'm not sure I have the five. All right. So the first one was setting aside all of the evidence, again, beginning at 283 of the JA, 100 pages of emails showing efforts to ensure that statutory duties are being approved. Second is that the district court, every time it dealt with that February 10th email, treated it as if it were a total ban on all work and either ignored or minimized the part of the email that directed employees to reach out for approval to perform statutory work. And then the court suggested that those approvals were given only fudgingly, even though Martinez testified that he had never had an approval request denied and the district court identified no instance of that ever happening. The court wrongly said that the approvals were only given for operational needs like keeping the lights on or the computers running, even though those emails clearly show that approval was repeatedly given for substantive work. The third point was going to be- I have a question about that one. I don't want you to lose track of your points because I think we'd all like to hear them all. But on the notion of asking employees to identify what's statutorily required, I was just trying to imagine any law office that I've ever worked in and whether- I'm not sure that individual employees are in a position to make that judgment. So if I'm working in supervision or in enforcement, is my one case that I'm working on statutorily required? I mean, it seems like what's statutorily required is to have a responsible policy about enforcement. And we see from administration to administration across my adult lifetime where the priorities shift and some things are geared down, fewer cases started, some cases may be resolved, even withdrawn. But the notion that anybody in a line operational job could look in isolation at their work and say this is statutorily required seems to me that only works when you're talking about something that Congress specifically identified. But surely it is statutorily required to have an enforcement program and to have a supervision program. It might be very different from the one that was conducted by a prior administration. But I mean, it just doesn't compute to me that it's an administration that is serious about fulfilling its duty. Granted, a duty infused with discretion, but that's part of my point, infused with top-down discretion, that it would be fulfilling its duty by asking employees to raise their hand if a case that they're litigating is within a statutorily required bucket. I don't think there's anything in the record here, Judge Pillard, that suggests that the leaders had outsourced that determination to the staff. What the email says is ask for approval if there's any urgent work that needs to be done, talking about this week when the building is shut down. That could be urgent statutorily required work, or it could be urgent non-statutorily required work. And I don't think it's unusual when you have leaders who are brand new at an agency to have staff help them understand what's going on and what needs to happen right now. Nor is it unusual to have a pause on activities when a new administration takes the reins, just to make sure that the happening at the agency, which are now under the watch of the new leadership, are consistent with the policy agenda of the new administration. So, in my list of five, the third was my point about how district court gave no weight to the efforts to ensure that the contracts that were needed for statutory functions were retained. The fourth, and this one, I think, straddles the line between clear error factually and legal error, which is that the court wrongly drew an adverse factual inference from government counsel's correct objection to a follow-the-law injunction. The court took from that objection an inference that, okay, that means no one at the Bureau knows what the statutory duties are, and that means your professed intent to perform them is nothing but a charade or window dressing. That was, I think, clear legal error to draw that sort of factual inference from a correct objection to an open-ended follow-the-law injunction. And then my final point on clear error was that throughout its analysis, the court ignored the presumption of regularity that should attend review of the executive officer's decision making. And I do want to circle back. Judge I think he has been unfairly impugned here because he never retreated from his core statement in his initial declaration on February 20th where he said that the agency's leadership has taken steps to comply with statutory obligations, and he believes that they were committed to fulfilling them. He never retreated from that. He did come back and say in his supplemental declaration that at a point earlier in time, he had been under the mistaken impression from things that he had heard from those affiliated folks that the agency was shutting down, and he said that for a short time thereafter, he believed that that was an instruction coming from agency leadership, and he later understood that that was not, in fact, the case, that the Bureau's new leadership was committed to fulfilling the essential statutory responsibilities. And so your understanding of Martinez was just suffering under a misconception when he said at various different times that he believed that the agency was shutting down. I think that's what his supplemental declaration says, that he had a misunderstanding that was not based on anything that actually came from the acting director. And to the extent that the 210 email actually did lead to required work not happening, that also is a miscommunication misunderstanding. I think so, yes. That's a misunderstanding. And I think the March 2nd email from Mr. Paoletta makes that clear, that the intent all along was to ensure that people were performing statutory duties while they were trying to get operational control of the agency. And I do want to be clear that there's nothing inherently wrong with a pause of even statutorily required functions for a short time if they're not urgent, in the sense that they don't need to be done today. If someone's working on a statutorily required report that's due in December, there's no problem with a new agency head coming in saying, let's pause that work for now if it's non-urgent so I can figure out if what you're doing is consistent with the priorities of the new administration. I'd be really interested if there were examples of prior administrations doing the kinds of things that the record here reflects. The accelerating of the RIF date for people that were placed on administrative leave because the notion was that there was going to be no need for a retention register because there would be no jobs. The final termination of contracts that had to do with data, that had to do with Internet security. I mean, there is a picture here in the record. And I appreciate, you know, you're really, I think, doing a really good job of putting that in context. But there's a really powerful record here of quite more ambitious action. And I am aware of being as concerned about the fact that you, it appears that you're characterizing it as ordinary to have the kind of pause that is taking place here. And I find that contrary to anything that I've ever heard. Well, I think there's obviously more than just the pause that's going on here. There is, as I said, a desire to radically downsize this agency. That is probably different than what has happened in previous presidential administrations. We now know after this court stayed parts of the district court's preliminary injunction and the leadership did a particularized assessment of how many employees they concluded were necessary to perform the agency's statutory duties, their number was 1,200. That's eliminating like 90% of the workforce. That is stripping the agency down to the statutory studs. And it's higher than what Martina said was planned, which was whatever it is, the 1,200 and then the rest, including him. So I do think you need to distinguish between the 1,200 and the rest. The discussion about the rest and this idea that all of the employees of the agency would be terminated, that is never connected to any decision by the leadership. There's pre-decisional deliberative documents talking about that, but there's no evidence that that was ever an agency approved plan. And that is the sort of thing that is why exactly you have a final agency action requirement in the APA, because you can't just assume that because some staff were planning some decision that that's ultimately going to be the agency decision as approved by the decision. All right. Thank you. So I assume you've reserved some time for rebuttal. I have three minutes. Thank you. Good afternoon. Welcome back to you as well. Good afternoon. Thank you. May it please the court, Jennifer Bennett for the appellees. The district court found that the defendants had tried to shut down the CFPB and if given the opportunity, they would immediately do so again. As the agency's own chief operating officer testified, without the court's intervention, the agency would have been wiped out in 30 days. And if that happened, it would have been irreparable. To this day, and I think we've the podium, the defendants have never disputed that shutting down an agency that Congress created is unconstitutional. In other words, this is different from most preliminary injunction appeals where the government is up here arguing, well, if what they say is true, that doesn't violate the law. That is not what's going on here. The defendants concede that if they did what the district court found they did, that would violate the constitution. Instead, they're making two arguments. The first I heard was that despite overwhelming evidence that they tried to shut down the agency, despite their chief operating officer telling employees at the time that the agency was being closed, the district court clearly erred in finding that that's exactly what was happening. And the second argument I heard is even if the district court didn't clearly err, that is even if they were shutting down the agency, even if they were taking an action that was indisputably unconstitutional, the district court still had no power to stop it. And in fact, I think I heard no court would ever have the power to stop something like that. Neither of these arguments has merit. The defendants have fallen far short of showing that the district court clearly erred, and they can't demonstrate that faced with an agency shutdown without any action from congress, that a district court lacks the power to stop it. And I'll start with clear air. I'm interested, I mean, even if one could look at some of the early actions as supporting a shutdown, just assuming that for a moment, the entire record that sort of follows February 10th, you know, before the preliminary injunction is entered, you know, the four, six weeks until that occurs, how does that, how do all of those emails, all of those actions taken by agency leadership, how do they support the idea that the agency was being shut down when there's so many instances that the agency in fact is being kept open, that statutory functions are being performed? I mean, why isn't it clear error in that record? Even if we bracket some of the early statements from the beginning. Sure. So I'll just go through piece by piece the evidence that the defendants, we just heard the defendants rely on. Before I do that, I just want to flag that the record we have here consists of two things. There's no administrative record that's been produced. There's no discovery. So the record we have are emails that the defendants themselves created and chose to put the record and, you know, a handful of things that whistleblowers gave us. So we don't have, we're, you know, we're not working from a record that is, you know, revealed all of the facts that were actually happened at the time. And we have basically a hand curated record from the defendants. But putting that aside, even on that record, you know, I'll go through each of the things that they said. So the first thing I heard was there are a bunch of emails. So again, these are the emails the defendants created and chose to put in the record. And those emails fall into essentially two buckets. There are a few emails that they identify that are before the district court entered an order. And then the vast majority of those emails are created in the days leading up to the preliminary injunction hearing. And the latter emails I think are really, it's really a voluntary cessation argument. The first set of emails, I think the argument they're making is there wasn't really an attempt to shut down. There was confusion. And so I think it's worth just going through one by one what they're relying on. So there are three exceptions that they point out of work that they say was allowed to continue. Each of those three exceptions was a task that as Martinez testified, Martinez testified that he advised the agency not to, while they were shutting down, not to turn off public facing things, they'd face a backlash. That's at JA-988. And that's also at JA-1091. And the three things, there are only three things they've identified that they didn't shut down at all. Each of those three things falls within that category. So there's the Home Mortgage Disclosure Act. That's a statutory requirement for mortgage companies to provide information to the Bureau. And Martinez testified he advised the Bureau that they needed to be really careful about turning that off because it's public facing. Yet. So they didn't turn that off. But what they did do is they put it at risk because of contract cancellations. That's JA-1094. I mean, these examples, I mean, at risk or only keeping things that are public facing, that doesn't suggest a shutdown of the agency, which is the essential factual premise for the preliminary injunction. Well, I think that your question was, let's assume that the evidence supports a conclusion that they were shutting down the agency. Do these emails sufficiently undermine it? And I think what these emails show is in the process of shutting down the agency, there are a few things the agency kept on during the time they were shutting down, essentially not to tip off the or at least it is not clearly erroneous to find that. And if you start, you know, if you go back to the first thing I was mentioning, the Home Mortgage Disclosure Act, so they kept it on technically, but the office that handles it would have been eliminated entirely on February 14th. That's at JA-518. So they're keeping it on. They're keeping something the public will notice on while they're planning to eliminate the whole office that does that task. It's not clearly erroneous to think that that is not demonstrating that they're not going to shut down the agency. Second thing I heard was an email about consumer response. Again, this is Mr. Martinez testified, JA-988. If you turn that off publicly, you're going to face a backlash. There's widespread media attention when they did in fact turn it on, turn it off, it's JA-130. And then the only thing they turned back on was the hotline. So they turned on the part that the public would notice, can you call in, but they didn't have any employees actually monitoring or responding. They didn't have the contracts. They point to this email that has a list of things that were needed to operate consumer response. All of those contracts were canceled. And then the last thing they talk about is the average prime offer rate. And again, this is a public facing act that the CFPB handles. And again, they were planning on February 14th to eliminate the whole office that did that. So you have their big examples of people doing statutorily required work. All three of them are examples of public facing tasks that would have gone away. And so it's certainly not implausible that what they were doing is covering their tracks. When you say plan, Ms. Bennett, I mean, Mr. McArthur has really emphasized the operative difference between a plan that is in somebody's head, there's a possibility, it's a thought, and a policy. We review only final agency action. So I'm just interested in when you say plan, well, it didn't happen, right? Well, it didn't happen because the average office that did that, has that been eliminated? No, and that's because the district court entered in order literally hours before that would have happened. And it can't be that, I'm sorry, please go ahead. The same thing about the hotline. Yes, yes. So the only reason that those were not eliminated is because of the district court's intervention. And it cannot be that if an agency is in the midst of executing a final agency action, when the district court intervenes, that it is somehow no longer final. That can't be right. So you're saying this is more than a plan. This is a decision already made. And these are components of the decision that were being carried out. I mean, it's a complicated thing, I guess, to shut down an entire agency. So decision made, that's the action. And when it's being executed, it generates a lot of evidence about the nature and existence of that decision. That's exactly right. And I think you can look at, for example, Biden v. Texas is an example of this. The decision was made to close the, you know, colloquially known as Remain in Mexico program to stop doing that. And what that decision said is, I direct staff to implement the decision. And the court said, that's a final agency action. And that's because you were directing staff, you were imposing an obligation on agency staff to not do this thing anymore. It's exactly what happened here. It's an obligation on agency staff to implement the closure of the agency. And I think what, I'm sorry, please go ahead. You had, I think, I do this way too much, ask questions that are, when you have a, we've asked you something that requires a set of responses and you, we asked you about the record and you were saying, you know, in response, I think to a question from Judge Rao, that the defendants, their narrative about what the record shows in just as distinct from what the plaintiffs say the record shows. And you started with the first bucket, which was email. And I haven't allowed you to go further. Oh, sure. So the next thing I heard the defendants rely on is that the this temporary pause. And I'll just go through the evidence on that. So one, the language of the SOP work order instructs employees to stand down from performing any work tasks. They set up a tip line that remains in place to this day. If you click on the link, you will go to the tip line that allows the public to report members of the CFPB working in violation of the SOP work order. That's a JA-701. He cited the SOP work order as justification for firing people. That's not a temporary pause. If you're firing people, if you're eliminating positions in the Bureau, because the Bureau has stopped its work, that's not a pause, that's permanent. That's JA-675 and 76. Mr. Martinez testified that at the time he told employees, there's a stop order across the board for all work associated with the Bureau. That's JA-1051. We know that employees were not, in fact, working. That's JA-145 and JA-161. And then there's lots of evidence in the record that employees did ask for permission to work, and they were either refused or just ignored entirely. That's JA-224 and JA-244 and JA-308. Is any of that evidence inconsistent with a temporary work stoppage, right, with a pause of agency action while the new leadership determines what direction to take the agency? Yes, and I just, I'll answer that because I think the answer is yes, but I just want to make clear, you know, the standard here is clear error. So what the defendants have to show is that it is not, at least, it's not plausible from this record as a agency, but to answer your question, is any of that inconsistent? The answer is yes. So they have a tip line, again, active to this day to report people who are not working. They use as a justification for firing people the stop work order. That is a permanent decision, and I'll note it's a justification not just for firing people, but for risk, which isn't just actually firing people. A risk is actually technically you're eliminating that position from the agency entirely. So they use the stop work order as a justification to entirely eliminate people from the agency. And I'll note that, you know, all of this is in the, in the background of all of this, of course, is that they canceled contracts. They were about to fire the entire agency. Mr. Martinez is telling people here's what's happening. We're closing down. We're legitimately shutting down, and they all of that. So I think that's the stop work order. The next bullet point I heard is that the court gave no weight to the effort to ensure contracts that were statutorily required were turned back on. That's just an example of, you know, the defendants cited the emails that they cite here. They cited them below, and they don't actually mean what the defendants are saying they mean. So they cite an email that talks about a vote saying, or maybe it was Paoletta at JA 1068 and 1069 saying, don't turn any, don't terminate any contracts without asking me. That is after, that is more than a week after all of the contracts were already terminated. I think it's a good example of the defendants creating something and putting it in the record to try to show that they were doing something when in fact that's not possibly what could have happened. The other set of, the other emails they identify is an email that the CFO sent around saying, hey, heads of divisions, please identify your statutorily required contracts. That email went around 90 minutes before they then canceled them all anyway. And they also cite an email that they say, well, Mr. Paoletta turned them back on. Mr. Martinez testified that actually wasn't true, that that's combining two different spreadsheets in a misleading way. In fact, what they turned on is a small number of technology contracts. This is JA 1070. And it's, you know, what I'm told from the contracting officers is that those are the technology contracts that you need to shut down an agency. So they're the contracts that give you the tickets, for example, so that you can keep track of the tasks that you're doing or the contracts that ensure that you can have the RIF software that you need. Those are the emails. Then we have a chunk of emails that are right before the district court's evidentiary hearing. And I think that really has to be a voluntary cessation argument. I don't see, you know, any way around that, but the defendants haven't made a voluntary cessation argument. I'm sorry, this is emails about... So they have a few, a handful of emails that are around February 10th that the defendants, I think, are saying, look, these show that we weren't really trying to shut down. Then if you notice, there's a gap. So there's a few emails that are really, I think, mostly about what the public is going to see. And then there's a gap. And then there's a flurry of emails that are days before the evidentiary hearing. And the story with those emails is, look, well, whatever happened in the beginning, we changed our ways. We're not going to do this anymore. You should trust us. That kind of argument, what the defendants would have to show, it would meet a formidable burden, as the Supreme Court said in FICRA, to show that there's no reasonable expectation that the conduct will recur. And as the Supreme Court said in FICRA, the standard applies to the government, just as it applies to everybody else. They haven't even attempted to meet that burden and they can't. You know, there's a bunch of emails saying that they're reactivating certain divisions, but there's evidence showing that that didn't actually mean people could work. So at JA 716, for example, people were told, go back to work publicly, and then privately sent text messages saying, don't go back to work. That cannot be evidence that they had changed their ways. 721 and to 722, those are examples of offices that actually couldn't perform the work because they've said, go back to work. They didn't have the contracts or the data that they needed to do it. JA 562, they say supervision could go back to work. The work that they were given was to write a report for payoletta and then go back on administrative leave. And recent reporting shows the work that they've recently been given is to organize their files. So that just can't be a genuine effort that satisfies the voluntary cessation standard. Maybe shift course a little bit. So to bring an APA challenge, there needs to be some discrete agency action that's being challenged. What is the discrete agency action? So the core discrete agency action is the shutdown of the agency. That's the only, so if we were to conclude, despite all the JA sites they provided, that there was, it was clearly erroneous to find that the agency was shutting down. Then would there be a discrete agency action? The district court found a second discrete agency action, a final agency action, which is the stop work order, which I think is also correct. The district court didn't reach whether there were any other actions that might be final. But to start with the shutdown, and I'll also note that the strictures... Finality, but also discrete. Sure, sure. Which are, as we were discussing earlier. Different, but related. Yes. Yes. And so I'll take them each in turn. But before I do that, I just want to flag that this discrete action, final action, none of these strictures apply to a constitutional claim under the separation of powers. I have questions about that too. Yeah. But to answer, to stay with your question, on the shutdown as a discrete agency action, I think that question is basically controlled by Biden v. Texas. It's very difficult to say, to see how Biden v. Texas could not be a discrete agency, how this could not be a discrete agency action. And the decision to shut down the Remain in Mexico program could be. It's the same thing. It's a direction, a plan to shut something down that requires several steps. If the defendants were right and you couldn't challenge the plan to shut down the Remain in Mexico policy, what you'd have to challenge is the cancellation of the contract with the bus drivers or the plane company that was taking people across the border. You'd have to challenge the firing of the chunk of employees separately who may have managed that program. You'd have to separately challenge any emails that went out telling people, stop working on this program. You'd have to separately challenge any policies. That cannot be the way it works. And in fact, the Supreme Court made clear that's not the way it works. The same thing is true in the Regions case. The same thing is true in the Western Watersheds Project v. Halland case, where you have a decision that says we want there to be zero horses. And there were a series of efforts to implement that decision. And in fact, what this court held, relying on Supreme Court precedent in that case, is not only was that first decision that there should be zero horses, not only was that a final agency action, once you started implementing it, you can't challenge the implementation steps. And so I think there would be a danger. If you say you cannot challenge the shutdown of an agency, at some point you'd run into the ripeness case law, which says once an agency starts implementing a final action, you can't wait several years until the final step that they take and then challenge the whole thing. So there would be actually quite a danger of holding that a shutdown is not a final agency action. So your main final agency action is the shutdown. I think that's right. It has to be the shutdown. And what kind of relief do you ultimately expect to get in this case? The relief that was entered that may be plausible, may be appropriate at the preliminary injunction stage. And as you mentioned, the record here is undeveloped. And if the preliminary injunction was up in place and there were fact-finding, the case as you described really is crystallized around a plan to shut down. So I'm sure it depends on what the evidence might show. But what are some examples of relief that you think your clients might be entitled to at the end of the day? So one, I think they would certainly be entitled to relief that vacates the plan to shut down. And the second is I do think they would be entitled to an injunction. I concede that it depends a bit on what the factual development is in the case and honestly, what the factual circumstances are at the time. We are not standing here before you today saying that I think there needs to be a permanent injunction that looks just like this preliminary injunction forever. I don't think that would be a reasonable position and it's not one that we would take. The president has withdrawn the nomination of the person who he nominated to be the head of the agency. I could imagine that the president would nominate someone else that that person would be confirmed and that that person would potentially be able to make the showing of voluntary cessation that would be necessary, for example. I imagine that's possible. I can also imagine that with more time, it would be possible to work out with the government a much narrower permanent injunction that is much more procedural and frankly, something along the lines to what didn't work in the preliminary posture but could work in a final posture with more details about, okay, of course you have the discretion to conduct lawful risks and what kind of plan would that look like or what would the procedure look like? So the district court judge is going to decide the extent of risks that the executive branch thinks is appropriate. So there would just be a constant judicial supervision. You can do a 40 percent risk but you can't do a 50 percent risk. I mean, what would that possibly look like? No, I want to be really clear that we don't think that the permanent... I mean, you've had a lot of cases in your brief that are from structural injunction cases like busing. So should it be that sort of situation where the district court, you know, at Mecklenburg takes over the running of the CFPB? No, I want to be really clear that that is not what we're asking for. We haven't ever asked for that. I wouldn't expect that to be necessary. Right, so the case is that... So I think the district court in... If what happened is say the district court enters a permanent... They take the shutdown plan, enters a permanent injunction that says don't try to shut down the agency and maybe it says something like you can do anything that in your discretion you have a good faith belief, you know, won't shut down the agency. Or does it? And the judge decides what the good faith is. Or just says don't... Not the president, not the senate confirmed head of the agency. Or just says don't shut down the agency, you know, you can imagine that. And then the district court says, you know, 50 percent risk is shutting down the agency. I think there... Yeah, to be clear, I think there, you know, it may be that at some point, you know, if the defendant... If there's evidence that the defendants aren't acting in good faith, of course, you know, there's nothing that would bar plaintiff from coming back into court, but I would not expect a permanent injunction to start there. And I would expect, frankly, you know, we've talked, you know, once there's a senate confirmed director in place, I would expect that there would be some evidence that perhaps something different was going on and maybe there isn't something, you know, necessary or at least not as a first step. So I want to be really clear that we are not saying that this preliminary injunction would be the permanent injunction. I think it would depend on a lot of factors that were true at the time. But what this preliminary injunction does is ensures that we are not having to worry about the agency being shut down in the interim as the case goes on. I mean, we have some experience managing, trying to manage this on an interim basis. And just speaking for myself, it was not a happy experience. And I mean, it does tend to highlight some of the difficulties with the case as you conceive it. And I think this is related to the discrete action point. But, right, you're taking a little hard to get my head around that in the abstract. But you're starting with a bunch of things that look like typical agency actions that would be the object of judicial review, like firing employees, canceling contracts, things like that. And you're putting all of them together to get this more general overarching shutdown action, kind of upstream from all the individual employment and contract decisions. And then to get standing, you're projecting downstream to people who are hurt one way or another, employees or people who need the hotline and so on. Right? But when you do all that, there's a huge gap between a shutdown action that you are framing as the focus of judicial review and the harm to these individuals who won't have someone answering the phone. And it seems to me that's what is putting the courts in this position of there's no obvious connection between the two. And so the court has to ask itself such as how many employees can the agency writ and yet ensure that the hotline phone gets answered? And what's the end game other than some form of very ongoing and intrusive judicial supervision? I strongly suspect that the end game is there's actually a pretty narrow final injunction. And the only way we get to something broader than that is if there's clear evidence that the government is violating it. And I'll note that in your hypothetical, the only challenging provision that anybody is really having trouble with is the RIF provision. And that would be even if that was the only aspect, because that is just a difficult line drawing problem. And I think the government has a lot of discretion there. But I want to go back and talk. I heard you say two things. One was that there are a bunch of individual decisions being challenged. And the second is that the harm is not very direct. And I want, if I may address both of those. A bunch of reviewable actions that are used to abstract, from which is abstracted the shutdown. So, and maybe those three, I'll start backwards in terms of abstracting the shutdown. So, if there were a piece of paper, if there was something published in the federal register that said we are shutting down, I think I heard the defendant say, I think it has to be right, that's not abstract. So then the question is, can an agency avoid review by hiding its decision, either by not writing it down, that's the Venetian case, or by, you know, I actually am not certain that it's not written down somewhere. We have no administrative record and we have no discovery. So right now, what we have is all of the evidence of what they did. And in the Venetian case, that's exactly what they had there too. What they said is, based on the record we have before us, we can infer that there's been this unwritten policy. And then, so that's one thing on unwrittenness. On individual decisions, I don't think that there have been a bunch of individual decisions here. There was not, we don't, there's nothing in the record that says we have decided to fire John and Jane and Adam, we're terminating contract X, Y, and Z. Everything in the record, and this is what the chief operating officer said at the time, and not just, by the way, the week of February 10th, but continuing long after that, everything in the record is, we are shutting down and here are the things, here are the main things the agency uses to operate. And so to implement that shutdown, we are going to cut them off. So contracts, wholesale, the staffing, wholesale, the work, wholesale. And so it's not a case like for example, where there are, in Lujan there are a bunch of individual decisions, they were not related, they were unlawful for a bunch of different reasons. And what Lujan says is that there's this one policy animating all those decisions, of course you can challenge it. That's what's going on here. It's not a bunch of individual decisions that are somehow aggregated. Lujan says you can't take a bunch of decisions that have a statutory focus. The agency is supposed to do some specific thing under some specific statute, and you get five or six of those, and you can't aggregate them into a land use plan. And this has some of that feel to it, right? Because there are lots of individual pieces from which you're building up this shutdown the agency action, which is not, there's no statute or reg that talks about shutting down the agency. This is why we're, you know, this has a little bit of nailing jello to the wall quality to it, trying to figure out is it there, is it not? So there's no agency record. I take your point on that, but in a way that sort of cuts against you, because it just makes the point there's no rule or order we can focus on as a basis for our review. So the very last point, it's not that there isn't an agency record, it's that we're not at the stage of the case where they've been asked to produce, they have to produce it yet. So I want to be just clear about that. But moving back, I realize that wasn't, you know, this is not, this is not a lawsuit. There's no, there's not, we're not, there's nothing in the complaint. It's not a lawsuit that says the plaintiff's challenged your decision to halt supervision. The plaintiff's challenged your decision to halt consumer response. The plaintiff's think that you were doing the wrong enforcement action. That I think would be more similar to Lujan, although similar to Lujan would be the plaintiff's challenged these 500 ways that the supervision decisions were wrong. That would be similar. Here, the plaintiff's challenged one thing, you are not operating the CFPB at all. Now, that's unlawful for a lot of reasons. It violates the separation of powers. It violates the Dodd-Frank Act. But that is, but they're not challenging, this isn't a challenge to the many different ways they're violating a statute. It's a challenge to a single decision to shut down the agency. And I think that distinguishes it from Lujan in two ways. One is that there is a unifying thing that is being challenged. And again, I think Biden v. Texas, I think Regents. I think the Siva-Geigy decision is also really helpful here. You know, in that decision, what the court held is there's this collection of informal letters that together make clear that there is a final agency action, that there is a policy. The Western Watersheds Project, same things. There are a bunch of cases, including cases from the Supreme Court that are exactly like this, where you're challenging a decision to close. The second way it's different is because it's a decision to close, the release is prohibitory. It's, you know, essentially don't close the agency. And I realize, you know, there may be, I realize there may be issues. And it took like five days from our stay order to compliance, you know, maybe proto contempt proceedings when, you know, the executive branch, which wants to go down, you know, 90% down says we think we can run the agency with 200 people. And the district court says, I don't believe that. And you have this, you know, big enforcement proceeding right away. I mean, I think that shows the wisdom of the district court's injunction on a preliminary posture, which is to say, there's a lot more we need to know to enter a refined, you know, permanent injunction and the preliminary injunction All we're trying to do is have a workable way of keeping the status quo in place. And I'll note that the defendants, what they said is we made this assessment. What the evidence shows the chief operating officer, who again has been their declarant in this case, agreed that if what they did were allowed to stand, the Bureau would not continue functioning even for 60 days. That's agreed. It cannot be that the defendants can come into court and say, you can't do anything to prevent us from shutting down the agency because we're going to make it hard for you by refusing to comply in good faith. That can't be What might a final injunction look like that would not involve this problem of how many, at what point are you firing too many people? Or at what point are you canceling too many contracts? Or at what point are you closing too many offices? Yeah, so I think the contract is a great example. The defendants have a list of contracts that they needed to operate the agency. It would be a very easy thing for them to produce. And they chose not to because they wanted a broader injunction that they could challenge. The same thing, the offices are listed in the statute, which offices need to be there. And then the risk provision, again, I would assume that once there is a Senate confirmed director, that will in fact, for example, the executive order, the memo that they talk about requires the submission of a plan to OMB. I believe, actually, that's not right. I think it's OPM. The defendants have never submitted any plan to do that. So they stand here and say, the reason we need this preliminary injunction to be lifted is so we can comply with this memo. And they've never even tried to comply with that memo. And so all we're talking about is a very different question, what gets permanently entered. All we're talking about is to give the district court the opportunity to rule on the merits of the case. And do you have any precedent? I looked briefly for this, but there are a lot of cases in which, and I think they're mainly cases in which the facts really aren't disputed and the issue is a legal one where court enters a preliminary injunction, preliminary injunctions upheld, and just becomes the permanent injunction. But I assume that there are many cases in which, like this one, it's the premise of the finding of the entry of the preliminary injunction is factual. Here it was fast moving, as you point out, the factual exchange of information has yet to occur. So preliminary injunction is preliminary and a lot can take place in between. Are there case examples that aren't like school desegregation or busing that you would have us look at that kind of show that relationship? Preliminary, a bit of a rough cut. I know we do have some cases saying a preliminary injunction can be something of a rough cut. I think in the, there was an Eighth Circuit case you cited, maybe it was the Biden. Nebraska v. Biden. Biden, where the defendants saw it tailoring and they said, no, you know, yes, it's overbroad, but it's preliminary. And that, you know, we didn't end up seeing the further interaction between sort of what does it look like at permanent versus preliminary. But I just wonder if you have any further, anything else for us to read or rely on in understanding that relationship. There are a few cases we say in our brief that stand for this proposition, and I can get you the page number of the brief that cite them. I, to be honest. They're there, I can find them. To be honest, and they talk, you know, there's a paragraph in our brief that talks about injunctions being a stopgap measure and examples of that. I'll put it in my mind. But to be honest, I don't, page 49, I am told of our brief. There you go. You know, to be honest, I am not positive that I know what the final injunction in those cases look like, but I'd be happy, I am certain there are such cases, and I'd be happy to do that research and submit them to you. If you haven't, that'd be great. I have a question that's sort of a little bit, or did, you tried to interrupt before. I tried to get a word in. Okay, I had a question about the constitutional claim. So maybe this is a good segue to that. How do we distinguish between a claim that the agency lacks statutory authority to do what it's doing and a claim that it is violating the separation of powers because it is doing something without statutory authority? Or I guess a clearer way to think about it is, you know, I remember Mr. MacArthur said, you know, one way to explain the president's announced intention to get rid of the CFPB is not as support for, you know, unilateral executive branch effort to do that, policy decision to do that, but that he intended to go to Congress and ask for that. How do we know, just as a legal matter, whether, well, no, he didn't do that. He's doing it himself without, you know, resentment and bicameralism and all of that versus just he's acting contrary to statute. So I think Dalton actually really helps on this because Dalton contrasts what happened in Dalton, which is the president approving the recommendation of a base closure and the Dalton court says that's different from what happened in Youngstown. And I think contrasting those two things and reading the Dalton court's comparison of those two things answers that question. So in Dalton, the president, no question, the statute says the president approves military base closures and the claim was you did it wrong, basically. I found like Youngstown to be more clearly on the other side of the line for Dalton, because there's no statute kind of invoked there, period. Well, so actually if you read, so if you read Youngstown, there were statutes on the books that said under what circumstances the president could seize property, but none of those statutes gave him authority to seize the steel mills under these circumstances. And so that's the difference. The Youngstown cases, there is no power to do this at all. Not you have the discretion to do it, but you did it wrong. I think if you- Isn't another important difference in Youngstown, the government was defending the president's action based on the president's inherent constitutional authority. And so it was a constitutional case. It wasn't a statutory case. Well, I think what Youngstown- It's a very different kind of defense. What Youngstown- So I didn't hear the defendants make any defense statutory or constitutional shutting down the agency. And what Youngstown stands for is if the president to have power to act constitutionally, the presence of article two means there's an article one, to not violate the separation of powers, the executive has to have either statutory power or constitutional power, but the lack of that power when the executive acts without either, then that's a separation of powers violation. I don't see any dispute about that. The government is not claiming an inherent article two power to shut down the agency. I mean, Mr. MacArthur said that it can't shut down the agency without congressional action. So- I think that's right. I think that just means the government concedes that if they did that, they violated the constitution. And so I don't think that that makes that not a constitutional case. It means that the government concedes the point that was at issue in Youngstown, not the framework. I don't see how you get around Dalton. I mean, Dalton makes very clear that you can't just repackage a claim that an executive branch official is not following a statute to be some kind of generic separation of powers claim. So how do you get around Dalton? I agree with that. And I think genuine looking at the comparison of Dalton and Youngstown really gives you that answer. So again, Dalton was, you violated the statute in doing a thing, the statute gives you power to do. Youngstown is neither a statute nor the constitution gives you power to do that. There's no claim. The district court pointed out, I think, as the defendants have conceded here, there's no claim that any statute or the constitution gives power to shut down the agency. And again, the claim here isn't, you have power to run supervision, but we think you're doing it wrong. That would be a Dalton claim. The claim that you are not operating a whole agency at all, that you shut down an agency that Congress created, that's a Youngstown claim. A constitutional claim then, like your APA claim, depends on there being a shutting down of the agency. It all rests on that. So if they weren't, in fact, shutting down the agency, all of your legal claims fail. I don't agree with that, but I do think that the clearest constitutional violation here is the one that the district court found, which is they were shutting down the agency without any authorization from Congress. So there's no constitutional problem with taking the agency to 10%. There might be a statutory claim, an APA claim, but there's certainly no constitutional claim. I think that is a fight about what it means to shut down an agency, what it means... But the district court never defined it. Well, the district court didn't need to have defined it because the evidence in the record showed that this is the easy case because we have testimony from the head of the RIF team saying we were firing everyone in two steps. Mr. Martinez, their chief operating officer, agrees with that. Mr. Martinez also says the agency is going to be eliminated. The agency is going to be completely wiped out. It's going to be legitimately shut down. It's going to be closed. So this is the easy case where we're just getting rid of an agency. I realize there might be harder separation of powers cases where they get rid of 90% and they take the 10% of people and have them do coloring or something. Maybe that's a harder case. But this case, the facts and what the district court found is they were getting rid of the agency completely. And so that, I think, is a clear constitutional violation. Your constitutional claim necessarily depends on establishing the statutory violations. You don't have a freestanding First Amendment claim. They could be complying with every statute, but they're nonetheless violating the First Amendment. Your claim is they are not going to do a bunch of things that the statute requires them to do, just run the agency, and therefore they're violating the take care clause or the separation of powers. No, I don't think so. The claim is not they're dependent, they're not going to do a bunch of things the statute requires them not to do. It doesn't matter what the Dodd-Frank, I do think there are a bunch of legal violations caused by the shutdown for that reason, but it doesn't matter what the Dodd-Frank Act says. What's the source of their obligation to run the agency? The power to create agencies and the power to end them is Congress's power. That's long been true. That's very clear. And so ending an agency that Congress created, whatever the statute says the agency has to do, getting rid of an agency is a separation of powers violation. I also think there's a problem if Congress says the agency has to have a supervision division and you get rid of it, but the clearest constitutional violation is it is Congress's power to create and to get, eliminate executive agencies. And the executive cannot unilaterally get rid of an agency that Congress created. Post-Congress created a component agency within the Bureau and said it's at the discretion of the director to run it or not. And it's being run and a new director comes in. It's like, I'm going to shut this down completely. I think it's fine. I think it maybe depends, but if Congress says there shall exist X agency, the executive cannot unilaterally get rid of that agency. That has long been understood to be a separation of powers violation. I don't understand why it's a separation of powers violation. Are you saying that the assuming article one authority? I mean, there isn't any sort of free-floating separation of power. What is the precise violation? Is it a violation of article two, the take care clause? What is the violation under the constitution? I think there are two. One is it's a violation of the separation of powers principles inherent in the constitution. We cite some cases in our brief. There's also- So you're talking about particularly the lawmaking authority that there has to be something specific. There has to appeal what Congress has enacted in order for it to legitimately be disregarded. There's no case- Bicameralism has said there's a separation of powers violation without identifying a specific provision of the constitution that has been violated. Can you think of one? Well, I think all of the removal, I mean, they've- Those are based in article two. There's an article two violation in terms of removal being inherent in the vesting of the executive power. I mean, it's tied to the text and structure of article two. So you need some text of a constitution to explain what the constitutional as opposed to statutory problem is. Sure. So the constitutional violation would be tied to article one. Congress has the power to pass legislation. And what the Supreme Court said in free enterprise, and there are cases going back before that, that it is Congress's power to create and eliminate agencies. Sure. But the president here hasn't purported to pass a law that Congress would pass. Right. But what the- Maybe it's a violation of the take care clause, but how is it a violation of article one? It isn't purported to make a statute without the house and the senate. Well, the way you create, and if you look at free enterprise, the way you create and eliminate agencies is by passing a statute. And so by doing that unilaterally, what the executive has done has usurped the article one power to do that. I think free enterprise is a good case. I think the Center for Constitutional Accountability is a brief, goes in long detail about all of the cases about this in the history of this. I think that's also helpful if you're wondering where the source of this power is. But I think it's a- I haven't heard the defendant's dispute, and I don't think there is any dispute that the executive cannot unilaterally either create or get rid of an agency. So it would be by capitalism and presentment, it would be violation of take care- Sure. Because the statute's still in the books, it would be what else? I mean, I think just also inherent in the constitution that it is Congress's power to do this. Courts certainly enforce the separation of powers in this way. Enforce it by reference to specific provisions of the constitution. That's right. And I think the provisions that Judge Pillard mentioned are the provisions on which the Supreme Court has rested in making clear that the power to create and dismantle agencies is the legislative's power, legislature's power. If the risk that was proposed after the preliminary injunction was in place and after we sought to clarify and narrow it were the first- were the action- I mean, I think this is unfair and maybe unproductive, but if the agency fired 90 people, would you have the same lawsuit or would that- I think I know the answer. That's the harder case. I mean, is it de facto shutdown? And it would be context. Yes. I agree with your answer to that question. All right. Thank you. Thank you. Mr. McArthur has reserved some time for rebuttal. Quickly on the Dalton point, I have no direct cause of action under the constitution for a separation of powers violation. The sort of simple way that I think about this is do you need to read the statute to figure out whether the alleged conduct is unlawful? And here you do. I think Mr. Bennett said multiple times that the executive cannot abolish an agency established by Congress. That's not a necessary metaphysical truth. You can imagine a statute that authorizes the executive to close an agency on making certain findings. The only way you know that's not the case here is to get out the statute and read it and see that it does not in fact authorize that and instead imposes certain mandatory duties that the agency must perform. This is a statutory claim that is the crux that the statute says there are certain mandatory duties and the defendants are taking action. If they shut down the agency, the Bureau will not perform the duties required by statute. That is clearly a statutory claim under Dalton. I thought Judge Rowe, your question to Ms. Bennett and her answer got to the heart of this case about what is the discrete agency action. And Ms. Bennett's answer was a shutdown. That is precisely what Lujan was talking about when it said that the APA does not authorize programmatic challenges. You can't take a collection of individual actions, ratchet up the general level of generality, and all of a sudden now you've got a program that you can challenge instead of the various discrete agency actions. So in that theory, if I am the newly appointed acting director of CFPB and I understand that my boss wants the agency eliminated and what I do is I riff 100% of the agency's employees. And I figure I don't need to get into contracts. I don't need to get into building leases. If I fire everybody, nothing's going to happen. You adhere to your same notion that the plaintiffs have to, that that's an illegitimate, that framing that as closing the agency as opposed to a litany of personnel actions is illegitimate under Lujan. Correct. The action there that a plaintiff could challenge if they had a cause of action would be the termination or the rift. The problem for them here is that Congress has channeled those claims to a different body. To the MSPB. To the MSPB, which can entertain challenges to rifts. It can. It can't actually. Right now. I think there was a case about that this morning. Yes, there may have been a case about that this morning. It's never come up because we understand that's a separate legal category, but is it really irrelevant here that the agency to which you insist the plaintiff claims are challenged is an agency that is not operative? Well, I think it's an overstatement to say that the agency is not operative. The agency lacks a quorum at the board level, but cases can still be heard by the administrative law judges. But also, I don't think that CSRA preclusion turns on that. That's why we haven't been talking about it, but I was just interested whether that mattered to you. I don't think it does. I think what matters is that Congress set up an exclusive review mechanism where these sorts of claims can be brought, including, for example, on a class action basis. The MSPB has regulations that provide for class claims, and if there's a meritorious claim there, they can order reinstatement. They can order back pay. They can unwind a RIF. So it's not as if we're saying there's no remedy for the discrete actions that actually happened here. It's just that the remedy lies elsewhere. Sorry, back to Judge Pillard's hypo. The agency action is a definitively and formally expressed 100% RIF, and your defense of that is, number one, the challenge has to go to the MSPB, but is there a number two that that is also too insufficiently discrete for Lujan, or would that be discrete? The RIF? Yeah. No, I think the RIF would be discrete enough for Lujan. Okay. But the problem there is the district court lacks jurisdiction to consider that. Ms. Bennett cited Biden versus Texas. Biden versus Texas is fundamentally different. There, there was actually a memo, a rescission memo, that we're getting rid of the MPP program. The court said that was a rule within the meaning of the APA. If you look up the definition of rule within the meaning of the APA, the first words are an agency statement. That's one thing we're lacking here. We don't have an agency statement of this program, whatever it is, and- Any response? I'm not saying there's never a circumstance where you could infer from circumstantial evidence that there's a decision, but I do want to say that I think you need to proceed with extreme caution here in inferring that sort of program where the two options on the table are ones that I outlined before of shut down entirely or take this agency down to the bare statutory minimum. It's not surprising that there's a fog of confusion about what's going on in the early days of implementing a policy where you are radically scaling back to agency. So I do think- I have to say, just, I mean, radically scaling down without a plan also seems to me extraordinary. I don't think that's the way it's been done in the past. And I recognize just because it hasn't been done in the past doesn't make it unlawful, but it is unusual. It is certainly unusual. And I don't think anyone would say that this was a smooth transition, but I'm not sure why you say there was a lack of a plan. I discern a very clear governing policy here, which is we're going to maximize to the extent possible the elimination of non-statutorily required functions. That's set out in the memo itself. Right. By people who have no internal familiarity with the nature of the agency, the work it does, the statutes it implements, that is a generic government-wide proposal. And to go in, I mean, I don't need to take you- you're the lawyer for the government. I don't need to take you to task for this, but it's part of what's at stake in the case is what feels like a rather reckless treatment of an institution and a lot of work underway and of a lot of people's lives. So it's just that I don't need to tell you something that you don't already know. The legal question here is, was the policy that they were implementing one that was lawful? Shut down the agency? Absolutely. Right? Absolutely. And I encourage you- Go ahead. I'm sorry. I didn't mean to cut you off. I was just going to say, I encourage you to look at this record for yourself and try to adjudicate between those two possibilities. I think you will see multiple points where agency leaders are doing things that are irreconcilable with the notion that they are closing the agency. Thank you. Really appreciate the work of both of you. Extremely well-prepared and really very helpful. Thank you.
judges: Pillard; Katsas; Rao